FILED
07/29/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2020

## SAMUEL JACE ENGLAND v. AMBER LEIGH LOWRY

**Appeal from the Probate and Family Court for Cumberland County
No. 2017-PF-5942     Brett A. York, Special Judge**

_____

### No. E2019-01660-COA-R3-CV

_____

A husband and wife were divorced after three years of marriage.  The trial court divided the marital assets and debts and designated the husband as the primary residential parent. The wife appeals the court's finding of transmutation and designation of the husband as the primary residential parent, and both parties challenge aspects of the division of property.  We affirm the trial court's judgment in all respects.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Probate and Family Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and CARMA DENNIS MCGEE, J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Amber Leigh Lowry.

Jonathan R. Hamby, Crossville, Tennessee, for the appellee, Samuel Jace England.

### OPINION

I. FACTUAL AND PROCEDURAL BACKGROUND

Samuel Jace England ("Husband") and Amber Leigh Lowry ("Wife") were married in 2014 and had a child ("Child") later that year.  Husband and Wife separated in 2017. Both parties filed a complaint for divorce and asked to be designated Child's primary residential parent.  In an order entered in December 2017, Mother was granted temporary possession of the marital home and the parties were awarded equal parenting time, with a 5-2-2-5 schedule.  Under this schedule, Child spent five days with Mother, followed by two days with Father, two days with Mother, and five days with Father.  The schedule continued without regard for weekends or holidays other than Christmas, when Father was to have Child with him from Christmas Eve starting at 3:00 p.m. until Christmas Day at

3:00 p.m. Mother was ordered to pay Father child support in the amount of $583 per month pending the entry of a final decree of divorce.

On August 21, 2018, Larry M. Warner, the probate and family court judge, entered a decree of divorce. The temporary parenting plan was to remain in effect until a final hearing, when all remaining issues would be resolved, including child support, property division (including assets and debts), and a permanent parenting plan. An evidentiary hearing was scheduled to take place on March 1, 2019. Judge Warner was not in court on that day; instead, attorney Brett A. York presided over the hearing as a special judge. The special judge heard the parties' evidence, and the court issued a final decree on May 21, 2019, which it amended on August 19.

The court found in the amended decree that the parties owned two houses at the time of their divorce and that both of these properties constituted marital property. Wife had purchased one of the houses, located in Louisville, Tennessee, prior to the marriage, but she had it put into both parties' names during the course of the marriage. The court found that "pursuant to transmutation and considering the substantial contributions of [Husband], this property became marital." The other house was located in Crossville, Tennessee, and the parties purchased this property during the marriage.

The court found Wife's company, Syssero, Inc., was her separate property, and Husband does not contest this finding. The evidence showed that Wife borrowed money from Syssero during the parties' marriage to purchase the Crossville house and pay for its renovations and related costs. The court ordered both houses to be sold and their proceeds used (1) to pay back the loans to Syssero and (2) to pay credit card debts owing to Home Depot and Lowe's that were incurred to improve the parties' real property. If any proceeds from the sales of the houses remained after the loans and debts were paid, the court ordered the parties to share them equally.

The evidence showed that Husband received a 2017 tax refund in the amount of $12,795 and that Wife incurred a 2017 tax liability of $29,000 in her name that was unpaid as of the time of the hearing. The court ordered the parties to split Husband's refund and for Wife to be responsible for the tax liability she incurred.

Husband testified at the hearing that he was working for a petroleum company and that his gross monthly income was $2,302.75. Wife was the sole shareholder of her company, which was an S corporation, and she did not introduce any documentary evidence specifying her income. In response to questions by Husband's attorney about her average annual income over the prior few years, Wife responded:

> My salary is a hundred and five thousand dollars. I've been making multiple distributions in 2017. So to answer your question I would have to look at my 2017 taxes. I believe in that year it was three hundred and thirty thousand

dollars. And last year it was anticipated to be roughly two hundred and twenty-five thousand dollars.

Wife also testified that she collected rental income of $525 per month from the Crossville house and rental income of $1,850 per month from the Louisville house. The child support worksheet attached to the permanent parenting plan that was included with the court's amended final decree identified Wife's gross monthly income to be $10,000 and Husband's gross monthly income to be $2,600. The court designated Husband as the primary residential parent and ordered that "parenting time should be equal." Wife was ordered to pay Husband monthly child support in the amount of $637.

Wife appealed the trial court's amended final decree. She first argues that the special judge, who presided over the proceedings and issued the final decree and amended final decree, lacked the requisite authority. Wife then argues that if we find the special judge was properly authorized to preside over the proceedings and issue rulings, the special judge erred by (1) applying the doctrine of transmutation to conclude that the Louisville house was marital property; (2) failing to divide her $29,000 tax liability equally between the parties; (3) designating Husband as Child's primary residential parent; and (4) establishing Wife's monthly income at $10,000 for purposes of calculating child support. Husband raises two issues on appeal. He argues the trial court erred in (1) finding Wife's distributions from Syssero constituted loans to the parties rather than income, with the result that proceeds from the sale of the parties' real property should be used to pay back these loans; and (2) awarding the parties equal parenting time during the school year now that Child is old enough to begin compulsory education, because the parties reside in different counties.

## II. ANALYSIS

### A. Authority of Special Judge

Wife challenges the authority of Special Judge Brett A. York to preside over the case and issue rulings in this matter. The statute governing the appointment of a special judge in this case is Tenn. Code Ann. § 16-15-209, which provides, in relevant part, as follows:

> (a) If the judge of a court of general sessions[1] or juvenile court finds it necessary to be absent from holding court, the judge may seek a special judge

---

[1]Judge Warner, who presided over the parties' case before the special judge was appointed, was a general sessions judge. The Probate and Family Court of Cumberland County is a court of general sessions and exercises concurrent jurisdiction with the circuit and chancery courts over domestic relations cases. Tenn. Code Ann. § 16-15-5004.

in accordance with the requirements of and in the numerical sequence designated by this section.

(1) If a special judge is necessary, the judge shall attempt to identify another judge who may serve by interchange, pursuant to § 17-2-208. If another judge cannot serve by interchange, a judge may seek to find any former or retired judge, who will, by mutual agreement, sit as special judge. The special judge shall serve by designation of the chief justice of the supreme court.

(2) If the judge is unable to secure a judge under subdivision (a)(1), the judge may apply to the administrative office of the courts for assistance in finding a judge to sit by designation of the chief justice as a special judge.

(3) Only after exhausting the procedures set out in subdivisions (a)(1) and (2), a judge may appoint a lawyer from a list, on a rotating basis, of lawyers that have been previously approved by the judge or judges of the district or county who are constitutionally qualified, in good standing, and possess sufficient experience and expertise. A lawyer appointed is subject to the following limitations, which shall be made known to persons attending any court proceeding presided over by a lawyer, as evidenced by an entry in the minutes or other permanent record of the court:

    (A) The lawyer may preside only if the parties and counsel are notified that the duly elected or appointed judge will be absent and that a practicing lawyer will serve as a special judge;

    (B) The parties choose to proceed and not to continue the case pending return of the duly elected or appointed judge;

    . . . .

    (D) At the opening of any court session presided over by a lawyer appointed pursuant to this section, an announcement shall be made to persons in attendance conveying the information contained in subdivisions (a)(3)(A) and (B). The making of such an announcement constitutes compliance with the notice requirements of this section.

. . . .

(d) Notwithstanding the provisions of subdivisions (a)(1) and (2), a general sessions or juvenile judge who encounters a sudden and unexpected emergency which causes the judge to be absent from court may forego the requirements of those subdivisions and appoint a lawyer in accordance with

subdivision (a)(3). The circumstances requiring the appointment of a lawyer pursuant to this subsection (d) shall be entered upon the minutes or other permanent record of the court in addition to the information required in subdivision (a)(3).

*See also* Tenn. Code Ann. § 17-2-118 (setting out procedure for judge to follow when good cause exists to appoint substitute judge).

The appellate record includes a document entitled "Substitute Judge Consent Form" that was signed by Judge Warner and Brett A. York on March 1, 2019. The document identifies the reason for Judge Warner's absence as "sick day" and includes the following "Notice to Parties":

> The substitute judge appointed to hear your case has not been elected by the citizens or appointed by the governor. You are not required to accept the service of a substitute judge. Without the consent of all parties the substitute judge shall not preside and the cause will be scheduled for another date. Consent must be granted by the parties who are present but may be granted by the attorney of record of any party who is not present at the beginning of the proceeding.

> By signing this form, you consent to the use of the below-named substitute judge in this proceeding.

The document does not include the signature of either of the parties or their attorneys, and the transcript from March 1 does not reflect that the appointment of the special judge was addressed in open court or that the parties orally consented to Mr. York's service. The failure of the court to obtain the parties' signatures on the Substitute Judge Consent Form does not mean that the parties did not orally consent to the appointment of the special judge, as permitted by Tenn. Code Ann. § 16-15-209(a)(3)(D).

The record reveals that this appeal is the first time Wife has challenged the appointment of Mr. York as a special judge. "It is well settled . . . that issues not raised at trial will generally not be considered for the first time on appeal." *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 764 (Tenn. 2006); *see also Winters v. Allen*, 62 S.W.2d 51, 52 (Tenn. 1933) ("The rule is well settled in this state, certainly in civil cases, that a party may waive the incompetency or lack of authority to act of the trial judge, and does so waive it by implication when no objection is made at the trial and in the trial court."). A special judge was appointed in the parental termination case *In re Marterrio H.*, No. W2016-01273-COA-R3-PT, 2017 WL 1372859, at *3, *7 (Tenn. Ct. App. Apr. 12, 2017), and, like here, the mother in that case failed to object to the special judge's presiding over her case before or during the trial. We held that she waived her right to challenge the special judge's authority to preside by failing to raise the issue at the trial court level. *In*

*re Marterrio H.*, 2017 WL 1372859, at *7. Similarly, we hold that Wife has waived the right to challenge Mr. York's appointment as a special judge by failing to contest the appointment at the trial court level.[2]

B. <u>Classification and Division of Marital Property</u>

In divorce cases, after classifying the parties' property as marital or separate, "the trial court is directed to 'equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.'" *Blakemore v. Blakemore*, No. W2018-01391-COA-R3-CV, 2020 WL 3468292, at *2 (Tenn. Ct. App. June 25, 2020) (quoting Tenn. Code Ann. § 36-4-121(a)(1)) (citing *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005), and *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)); *see also Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009). Separate property includes "[a]ll real and personal property owned by a spouse before marriage," Tenn. Code Ann. § 36-4-121(b)(2)(A), and it is not subject to division, *Snodgrass*, 295 S.W.3d at 246. "Marital property" is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A).

"The division of marital property involves the distribution of both marital assets and marital debts." *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). Although not defined by statute, the Tennessee Supreme Court has defined "marital debts" as "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Trial courts are directed to divide marital assets and debts "to assist in meeting the disadvantaged spouse's financial needs when feasible." *Robertson*, 76 S.W.3d at 341.

An equitable division is not necessarily an equal division. *Id.* Issues concerning the classification of property present questions of fact. *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). Therefore, we review a trial court's decision classifying property de novo with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Bertuca v. Bertuca*, No. M2006-00852-COA-R3-CV, 2007 WL 3379668, at *4 (Tenn. Ct. App. Nov. 14, 2007). A trial court's conclusions of

---

[2]Even if Wife had properly challenged the special judge's appointment at the trial court level, a procedural irregularity would not necessarily require that the special judge's rulings be vacated on appeal. As we noted in *In re Marterrio H.*, "[i]f a special judge acts under color of right, 'with a good faith belief in his right to exercise such authority,' he or she serves as a de facto judge." *In re Marterrio H.*, 2017 WL 1372859, at *7 (quoting *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 739 (Tenn. 2000)). Wife presented no evidence that Mr. York did not act in the good faith belief of his right to preside as a special judge in this case.

law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

The trial court has broad discretion in equitably distributing marital property between the parties, and we will defer to the trial court's distribution on appeal unless it is not consistent with the statutory factors or is not supported by a preponderance of the evidence. *Blakemore*, 2020 WL 3468292, at *2 (citing *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)); *see also Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). In making an equitable division, the trial court is guided by the twelve factors set forth at Tenn. Code Ann. § 36-4-121(c).

1. Louisville Property

Wife acquired the Louisville property before she and Husband were married. The trial court determined that this property's status changed from separate property to marital property as a result of transmutation. Under this theory, "separate property may be deemed marital by operation of law." *Snodgrass*, 295 S.W.3d at 247. Transmutation occurs when the parties treat separate property in such a way that their actions evidence an intent to change the status of the property from separate to marital. *Langschmidt*, 81 S.W.3d at 747 (citing 2 Homer H. Clark, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 16.2 at 185 (2d ed. 1987)); *see also Eldridge v. Eldridge*, 137 S.W.3d 1, 13-14 (Tenn. Ct. App. 2002) (citing *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988)). One way transmutation can occur is if one of the parties purchases property using separate funds and then places the property in both parties' names. *Batson*, 769 S.W.2d at 858 (citing 2 Homer H. Clark, THE LAW OF DOMESTIC RELATIONS § 16.2 at 185).

The basis for the court's determination that transmutation occurred with regard to the Louisville property was that (1) after the parties were married, Wife arranged for the Louisville property to be titled in both Husband's and her name, and (2) Husband made "substantial contributions" to the property. Wife argues that even though she had the Louisville property placed in both her and Husband's name and refinanced it in both of their names, Wife did not treat the property as marital property because she paid for the renovations and made the mortgage payments herself. At the hearing, Husband testified about the contributions he made to the Louisville property:

> I set in doing work on the [Louisville] home. I stripped the basement and put the basement back together. I did multiple upgrades on the home. Painted the house. Worked on the deck. I did multiple landscaping. Pretty much any upkeep or maintenance that needed to be done was done by me. And in that process we also refinanced the home once we were married and put the house in both our names, and went from that thirty year mortgage to a fifteen year mortgage.

The case *Woodward v. Woodward*, 240 S.W.3d 825 (Tenn. Ct. App. 2007), is similar to this case and is instructive. In that case, the parties were married for a short period, just three years, one of the parties purchased real property prior to the marriage, and that piece of property was retitled in both parties' names during their marriage. *Woodward*, 240 S.W.3d at 829. The trial court found that the parties commingled their formerly separate property during the marriage and that the real property became marital property subject to equitable division once the parties were divorced. *Id.* at 827. On appeal, we found that the doctrine of transmutation applied. *Id.* at 829. We stated that when one of the parties brings real property to a marriage and then retitles it in both parties' names, that party creates "a rebuttable presumption of a gift to the marital estate." *Id.*

As in *Woodward*, Wife and Husband lived in the Louisville property after they were married, and it became their marital home. In addition, Husband testified that he contributed to the maintenance and upkeep on the property and performed multiple upgrades on it. Wife has failed to rebut the presumption that she made a gift of the Louisville property to the marital estate. Thus, we affirm the trial court's classification of the Louisville property as marital property.

2. Parties' Debts

The parties testified about their debts at the hearing, but no documentary evidence was introduced reflecting the amounts. Wife testified that her company made two loans to the parties, one for $60,000 and another for $80,000. Wife testified about the $60,000 loan as follows:

> In order to purchase [the Crossville house] I took out a sixty thousand dollar loan from Syssero and financed it fully with the forty-thousand dollars paying for the house and the other twenty to start the renovations. Because as Mr. England testified, it needed to be gutted to the studs and then built up.

Wife provided the following testimony with regard to the $80,000 loan:

> Mr. England gave me a list of all the debts that we had. The Home Depot, the Lowes credit card, his Visa, and as part of that he said, "Hey, we are eyeballs deep in debt," as you heard. And that eighty thousand dollars was to pay off those amounts so that he could continue construction work on the Lakeview house.

Wife also explained the terms of one of the loans she obtained from her company:

> Q: The loan from Syssero, what are the terms for repayment on that loan?

A: The terms for repayment is 1.25%. I tried to get the lowest federal minimum in order to make this a true business loan. And I've been paying up until he served me divorce papers. It was over nine hundred and ninety-five dollars a month that I was paying for that loan.

Q: And for purposes of tax purposes and everything, this is a real loan?

A: For tax purposes as well. If it was considered a distribution then we would have had to pay thirty percent of those distributions and that would have affected our 2017 taxes.

Wife testified that some of the money from the loans was also used to help Husband start a construction business. In addition to the loans, Wife testified that she owed $29,000 in taxes from 2017. She suggested that if Husband's tax refund in the amount of $12,795 could be used to reduce her tax debt, she "would be responsible for the other."

The trial court apparently found Wife's testimony with regard to the funds from Syssero credible. It treated the money the parties received from Syssero as loans, classified them as marital debts, and ordered that the loans and the parties' remaining credit card debts be paid from the proceeds of the houses. Husband contends that the funds the parties received from Syssero should be treated as distributions from Wife's company rather than as loans (and classified as a marital debt) and argues he should not be responsible for paying any of this money back to Syssero.

As discussed above, the classification of assets and debts as marital or separate property involves issues of fact, which we review de novo with a presumption of correctness. TENN. R. APP. P. 13(d). "[T]rial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses,'" with the result that appellate courts afford them "considerable deference when reviewing issues that hinge on the witnesses' credibility." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We will not reevaluate a trial court's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)). We find that the evidence does not preponderate against the trial court's finding that the funds received from Syssero constituted loans, which turned into marital debts upon the parties' divorce.

The court treated Husband's $12,795 tax refund as a marital asset, but it did not specify if it was treating Wife's 2017 $29,000 tax obligation as a marital debt or separate debt. The court directed that $6,397.50, which was one-half of Husband's tax refund, was to go to Wife "for the tax liability incurred during the marriage in her name only," but it did not specifically allocate the remainder of Wife's 2017 tax liability to either party. Wife

incurred her 2017 tax obligation during the parties' marriage; therefore, it should be classified as a marital debt. *See Alford*, 120 S.W.3d at 813.

When determining how to divide marital debts equitably, the Supreme Court has directed courts to consider the following factors: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Id.* (citing *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)). The *Alford* Court determined that "[a] careful application of these factors will insure the fairest possible allocation of debt." *Id.* at 814. Wife testified that she incurred the tax obligation as a result of the loan proceeds that she received from Syssero and argues that both parties benefitted from the distributions. At the hearing, Wife suggested that Husband's tax refund be used to pay down the tax liability and that she would be responsible for the remaining amount. In ordering the sale of the two real estate properties with the proceeds to be used to pay the loans back to Syssero, the trial court caused both Wife and Husband to share in the repayment of the loans. Wife earns significantly more than Husband and is better able to pay the tax liability that remains after her half of Husband's tax refund is applied to reduce her tax debt. Neither Husband nor Wife showed that the court's distribution of the parties' debts is not equitable. Accordingly, we affirm the trial court's division of the parties' marital debts.

C. Permanent Parenting Plan

1. Primary Residential Parent

When divorcing parties have a minor child, the trial court must determine who will be the child's primary residential parent. Tenn. Code Ann. § 36-6-106(a). The determination is based on the child's best interest, the parents' residences, the child's need for stability, and consideration of the following factors:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and

the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

*Id.* The Tennessee Supreme Court has described the limited scope of an appellate court's review of a trial court's custody determination:

[T]rial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (citing *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007)). "Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Id.* (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

On appeal, we review a trial court's decision regarding parenting schedules for an abuse of discretion. *Armbrister*, 414 S.W.3d at 693 (citing *Eldridge*, 42 S.W.3d at 88). This Court stated, "'An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)); *see also Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014) (applying same standard announced in *Armbrister*—a case involving modification of a residential parenting schedule—to a trial court's initial primary residential parenting designation). "Appellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Kelly*, 445 S.W.3d at 696 (quoting *Armbrister*, 414 S.W.3d at 693); *see Eldridge*, 42 S.W.3d at 88.

*C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017).

The trial court in this case considered the factors set forth in Tenn. Code Ann. § 36-6-106(a) and designated Husband the primary residential parent based on the following findings of fact:

7. Considering the factors in T.C.A. § 36-6-106, the Court finds that both parents have a good relationship with the child, are good parents and have a willingness and ability to perform parental responsibilities.

8. Both parents encourage a good relationship between the child and the other parent. There has been testimony about a dispute at the exchange of the child. The Court directs that each party respond as quickly as possible to texts and emails regarding the child.

9. Both parents have attended the required parenting class. Both parents are able to provide the child with food, clothing and necessary care.

10. The parties are equal as to who has been the primary caregiver. The parties are equal as to their love and affection for the child.

11. As to the emotional needs and developmental level of the child, the Court finds that the child is healthy and doing well in school.

12. The moral, physical and emotional fitness of the parties as it relates to their ability to parent are equally factored, as each is a fit and proper parent.

13. The child has significantly more contacts in Cumberland County with the family of the Plaintiff. The interaction and interrelationships with siblings, relatives and others weighs in favor of the Plaintiff. The Plaintiff is engaged to be married and his fiancé has stepsiblings of the child who have a close relationship. The Plaintiffs' parents live in Cumberland County and are active in the child's life, and the Plaintiff testified that he was raised in Cumberland County and intends to be planted here. This factor leans in favor of the father.

14. The child has lived in a stable and satisfactory environment with both parents. Each parent has shown good choices in those that reside in or frequent their homes.

15. The child is not 12 years of age and there is no evidence of physical or emotional abuse, so these factors do not apply.

16. As for each party's employment schedule, each party has testified that they can take off as they see fit, or in the father's case, if he cannot take off

he has extended family to help. It takes a village to raise a child, and he has that. There is no advantage to either party with this factor.

17. The Court does not find any additional statutory factors relevant to parenting time. If the parties both lived in Cumberland County, the decision would be easy, but they do not. The mother chose to move to Chattanooga. Both parents have testified that the child is doing well and [is] adjusted. That may change once school starts, but that is a year and a half away. The Court finds that it should continue with the joint and equal parenting time arrangement. However, it should be modified to seven days on, seven days off. If the parties want to agree during the week, because the child is not in school, to parenting time during the week or in the evenings by agreement, they may, but the Court will not order extra parenting time.

18. Since the mother, without the father's or the Court's permission relocated, she should be responsible for providing all transportation for exchange of the child, to be at a location by agreement of the parties or, if they cannot agree, then at the Justice Center in Crossville, Tennessee.

19. As for primary residential parent, because of the one factor that certainly resonated in the father's advantage, he should be designated primary residential parent. However parenting time should be equal.

Wife challenges the trial court's findings with respect to statutory factors nine and fourteen, which correspond to the trial court's paragraphs thirteen and sixteen, above. She contends that she has a brother and sister-in-law in Chattanooga, and that the trial court failed to give sufficient weight to her family support system when determining that factor nine favored Husband. She also argues that her work schedule is more flexible than Husband's and that factor fourteen should favor her. As discussed above, a trial court has broad discretion when fashioning a parenting plan, and it "take[s] into account a number of factors, 'including the parents' demeanor and credibility during the divorce proceedings themselves.'" *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Appellate courts are, thus, "'reluctant to second-guess a trial court's decisions' regarding child custody." *Id.* (quoting *Gaskill*, 936 S.W.2d at 631). Wife failed to show that the trial court abused its discretion in concluding that Husband should be Child's primary residential parent. Accordingly, we affirm the trial court's ruling designating Husband as Child's primary residential parent.

2. Residential Parenting Schedule

The trial court awarded Husband and Wife alternating weeks with Child. Husband contends that the trial court erred in awarding each party equal time with Child because the parties live in different counties and Child is scheduled to begin kindergarten in the fall of

2020. According to Husband, Child should attend school in Cumberland County, where Husband lives, and should not be spending every other week at a different school. When the trial court entered its amended decree in August 2019, Child was not yet school-aged, and Husband did not establish that the trial court erred in setting the residential schedule the way it did based on Child's age at that time.[3]

### 3. Child Support

The child support worksheet included with the permanent parenting plan that the trial court entered as an order reflects that Wife's gross monthly income is $10,000 and that she is to pay Husband $766 per month in child support. Wife contends that the court failed to follow the child support guidelines when it found her monthly income was $10,000. She argues that the court improperly imputed to her the retained earnings of her company, Syssero, when there was no evidence that the company's retained earnings were excessive or that income was being manipulated. *See Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005) (concluding that "for the retained earnings of a corporation to be imputed to the sole or majority shareholder of a corporation, there must be a showing that those retained earnings are excessive or that the income is actually being manipulated."). A careful review of the transcript from the hearing shows that Wife introduced no testimony or documentary evidence regarding Syssero's retained earnings. Wife testified, however, that her annual income was $105,000. She also testified that she made "multiple distributions in 2017." She then testified that she thought her distributions in 2017 totaled $330,000 and that her distributions in 2018 totaled "roughly $225,000." Wife further testified that she collected $2,375 each month in rental income from the parties' two houses.

The child support guidelines specify that the "[g]ross income of each parent shall be determined in the process of setting the presumptive child support order and shall include all income from any source," including wages, salaries, income from self-employment, bonuses, dividend income, and interest income. TENN. COMP. R. & REGS. §1240-02-04-.04(3)(a)(1). The guidelines provide that "[v]ariable income such as commissions, bonuses, overtime pay, dividends, etc. shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income." *Id.* at -.04(3)(b). Based on Wife's own testimony, her average monthly income exceeded $10,000 as of the time of trial. Regardless of the title given to the $330,000 distribution in 2017 or the "roughly $225,000" distribution in 2018, we conclude that the trial court did not err in calculating Wife's child support obligation based on her gross monthly income of $10,000.

---

[3]Now that Child is ready to begin school, Husband may have a basis for requesting a modification of the residential schedule pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(C).

III. CONCLUSION

The trial court's judgment is affirmed in all respects. Costs of appeal shall be taxed to the appellant, Amber Leigh Lowry, for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE